# Exhibit 4

**Boines Transcript Pages**

```
              UNITED STATES DISTRICT COURT

              EASTERN DISTRICT OF MICHIGAN

                   SOUTHERN DIVISION


SHAMARA BOINES,

             Plaintiff,
                            Case No. 2:21-cv-13010-GCS-KGA
vs                          Hon. George Caram Steeh
                            Mag. Kimberly G. Altman

JARS HOLDINGS, LLC,
d/b/a JARS CANNABIS and
RAYMOND ABRO, Jointly and
severally,

             Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



    VIDEOTAPED DEPOSITION OF SHAMARA BOINES,

taken on Tuesday, October 11, 2022, at 12900 Hall Road,

Suite 350, Sterling Heights, Michigan, at 10:00 a.m.,

pursuant to Notice.






            Reported by DEBORAH LINEHAN, CER 7251
```

Fortz Legal Support

www.FortzLegal.com

844.730.4066



Page 26

1 What -- we're going to give you this work. You're
2 going to be on call available for us to do X number of
3 hours a week --
4 A Yes.
5 Q -- here's what we're going to pay you.
6 A Yes.
7 Q Okay. It wasn't for a fixed period of time that you --
8 A No.
9 Q -- okay. How about with LegalEase, did you have a
10 contract with them?
11 A Yes.
12 Q And then was that for full-time work?
13 A No.
14 Q It was just on an as needed?
15 A Yes.
16 Q Okay. The -- did you provide -- or did you receive any
17 health or other benefits with Consilio?
18 A I do not have health benefits with Consilio. No.
19 Q Any other benefits besides the just hourly pay?
20 A I have a 401(k) with them. I just started putting the
21 bare minimum in with that. Yes.
22 Q What's the bare minimum?
23 A I don't know. It was just the minimum that they set,
24 and if you didn't object to it they just automatically
25 enrolled you into it and started doing it, and I didn't

Page 27

1 object to it. I just left it.
2 Q Did they just start the 401(k) program?
3 A I think it's about a month or a couple months ago. It
4 hasn't been very long.
5 Q Okay.
6 A So it's not very -- I think the last I looked it was
7 like a couple hundred dollars in there.
8 Q So it's not a matter of you are eligible or not
9 eligible at a certain date; it's -- it's when they
10 actually started offering that as a -- as a benefit?
11 A It was eligible at a certain date, and then you had to
12 object to it. I believe that's how it went and you
13 either said yes or no, and if you said no they just
14 automatically put the minimum of what they suggested to
15 put in there.
16 Q Okay. Any other benefits with Consilio?
17 A No.
18 Q Do you get vacation days?
19 A Sick days. I believe it is sick days, yes.
20 Q How many?
21 A I'm not sure of the amount. I think it's based on how
22 much work you do with them.
23 Q Okay. How about with LegalEase? Did you receive any
24 benefits when you were working with them?
25 A No.

Page 28

1 Q These contract attorneys, do you have any benefits when
2 you work for any of them?
3 A No.
4 Q Are any office expenses, paper, or anything like that
5 covered when you're working for any of these attorneys?
6 A No.
7 Q How about with Consilio?
8 A No.
9 Q LegalEase?
10 A No.
11 Q So prior to doing -- or even I guess in the middle of
12 doing this contract type work you took a job with JARS,
13 correct?
14 A Yes.
15 Q And what was the time frame that you were employed
16 there?
17 A For JARS?
18 Q Yep.
19 A March to July. March 2020 to July 2020.
20 Q Okay. Before March of 2020, what were you doing for
21 work?
22 A I was not working before March 2020.
23 Q When was the last time that you were working before
24 March of 2020?
25 A It was -- I want to say it was October of 2019 I was

Page 29

1 working.
2 Q What were you doing?
3 A I was working for PharmaCo.
4 Q And what did you do for PharmaCo?
5 A I was a compliance specialist.
6 Q And how long did you work there?
7 A I worked there from -- I want to say it was May, if I
8 recall, of 2019 to October of 2019.
9 Q Okay. And PharmaCo I have in your resume you worked
10 at -- out of a Southfield office; is that right?
11 A It was originally the Farmington office. While the
12 Southfield office was being built, the Southfield
13 office became the corporate office.
14 Q And what was in Farmington? Where were you working
15 then?
16 A It was just the office they rented out at that time.
17 Q Okay. So not like a store location or anything like
18 that?
19 A No. It just was a corporate office space that they
20 rented -- they shared with another person -- another
21 company.
22 Q Okay. As a compliance officer at PharmaCo, what did
23 you do day-to-day?
24 A It varied. I did the applications for new facilities.
25 I submitted those for municipal and for LARA for the

Page 30

1 State of Michigan. So all of the documentation needed
2 if a new facility was going to be opened, a --
3 created any kind of support documentation such as
4 security manuals or security profiles that went with
5 that application. I created --
6 Q With what application?
7 A -- state and local you have to have an application to
8 open a facility, and with the State of Michigan you
9 need an application process, and certain documentation
10 must be provided in order for them to approve it.
11 Q Okay. So -- so your work as a compliance officer is
12 with respect to the opening of cannabis facilities for
13 PharmaCo; is that right?
14 A For the most part, yes. There were other things that I
15 had to do.
16 Q Okay. What else?
17 A I had to create policies and procedures for the
18 facilities.
19 Q What does that mean?
20 A The facilities needed protocol on circumstances such as
21 opening the facility, what to do to handle cash
22 handling matters, balancing drawers at the end of the
23 day, any kind of incident reports or security
24 protocols, those are things that I wrote policies and
25 procedures and trained on.

Page 31

1 Q So the -- are those policies and procedures required
2 for the opening of the facility?
3 A Some of them are, yes.
4 Q Okay. And then you said I think you trained on them.
5 So once the -- a new store location opened you would
6 actually be responsible for training the employees?
7 A I would train the manager. I would start with the
8 manager first, and then we would -- the manager can
9 roll that out to the employees.
10 Q Okay. So you only train managers?
11 A Majority of the time, yes.
12 Q All right. So would you have to train a manager on
13 counting drawers and things like that, or what would
14 you be training them on?
15 A Procedures and policies. MRA policies that have to be
16 completed inside of the facilities to make sure that we
17 are compliant. Those are things that we would train
18 on. Anything dealing with human resource stuff I would
19 work with a human resource person at the time, if
20 needed. Anything dealing with compliance and
21 regulatory, I tried to keep the managers up to date in
22 case there was any kind of surprise visits.
23 Q Okay. So let me break that down. The MRA policies
24 that you would train the manager on would include what?
25 Give me some examples.

Page 32

1 A Let's see, I have to think. How much product they can
2 keep in the facilities, how to input the product in the
3 database, policies as far as eating and drinking around
4 the product, how the product had to be safeguarded, how
5 the product needed to be visible in front of cameras,
6 employee relations when it came to handling the
7 product. Did you want me to continue?
8 Q Yep.
9 A Okay. The -- as far as security protocols, having the
10 security team there when product was coming in and out,
11 any kind of compliance issues that occurred, the
12 process and procedure that the company itself wanted
13 them to do to handle any kind of compliance issues that
14 might occur.
15 Q So if there's a state regulatory agency compliance
16 issue --
17 A Yes.
18 Q -- you would get involved?
19 A Yes.
20             (Mr. Scott left the conference
21              room at 10:39 a.m.)
22 BY MS. BADALAMENTI:
23 Q Okay. So that's different than opening. So let's talk
24 about that.
25     What would your involvement be?

Page 33

1 A For what?
2 Q If there's a state regulatory issue with a store, what
3 happens?
4 A They would call me --
5 Q The store manager?
6 A -- the store manager or it could be an employee that's
7 there and the store manager is not there, and I would
8 handle the situation accordingly. It just depends on
9 what the circumstance was. It could be a question.
10     Rather it's a patient that had an issue as far as
11 the amount of marijuana they wanted to purchase and
12 there's a discrepancy with the computer, then I would
13 have to either call LARA or do the research to figure
14 out how to solve the problem.
15     It could be a marketing issue. They could have
16 put a sign up that a compliance person for the state
17 saw driving by and said you need to take it down. So
18 it could be something of a matter of solving that
19 issue. It could be something they posted on social
20 media that wasn't compliant with state regulations,
21 then I would have to troubleshoot that. It just
22 depends. Every day was a different thing.
23 Q Okay. You also said that you would work with the HR
24 person. Who was the HR person at PharmaCo when --
25 you --

Page 34

1  A  Katrina Cotton.
2  Q  -- there?
3     Katrina with a K?
4  A  Yes.
5  Q  And what's the last name?
6  A  C-O-T-T-O-N.  Katrina Cotton.
7  Q  Just like it sounds.
8  A  Yes.
9  Q  Okay.  What -- was Katrina the HR manager?
10 A  Yes.
11 Q  Okay.  And that was the whole time that you were there?
12 A  Yes.
13 Q  And what did you work with Katrina on?
14 A  I worked with her on the employee handbook, any
15    employee relations that would occur dealing with the
16    hiring or terminating of any kind of employee to make
17    sure that if there was an issue as far as the employee
18    being terminated because of, you know, something that
19    went against state regulations that they're not
20    supposed to do within the facility, what's the step
21    next that we have to handle.  I worked with her on
22    training employees, background checks for employees
23    that started to work for the facility which we had to
24    have, any kind of requirements for hiring new employees
25    to make sure that they were eligible to work.

Page 35

1  Q  Did you actually interview and decide who would be
2     hired at PharmaCo?
3  A  No.
4  Q  Did you actually terminate employees?  Did you give
5     them notice of their termination?
6  A  No.
7  Q  Did you make decisions to terminate employees?
8  A  I don't recall specific, but there were some
9     circumstances where I was involved.
10 Q  Can you give me an example of how you were involved in
11    one?
12 A  I have to -- I can't really give too much of the
13    examples of those things because it's confidential.
14 Q  Did you sign some sort of nondisclosure agreement?
15 A  Yes, I did.
16 Q  Was that at the time you were hired?  At the time you
17    were let go?
18 A  That was at the time that I resigned.
19 Q  And you resigned in October 2019.  Why was that?
20 A  I can't discuss the -- the information that's in that.
21    MS. BADALAMENTI:  So I think we'll have to --
22 if she's going to stand on that, I mean, I need to
23 know --
24    MS. BRAULT:  What is it that --
25    MS. BADALAMENTI:  -- it's obviously very

Page 36

1  relevant.
2     MS. BRAULT:  -- you're needing to know that
3  -- that --
4     MS. BADALAMENTI:  Well, I want to know why
5  she resigned.  I want to know the circumstances of her
6  resignation.  She worked there for about six months
7  just like she did for us so I obviously am entitled to
8  know.  It's the same industry.  She's working in the
9  same type of position, and her reasons that led to a
10 six-month-end resignation are obviously going to be
11 relevant.
12    MS. BRAULT:  I don't know that that's true.
13 I'm not sure how it's relevant to claims -- subsequent
14 employee.
15    MS. BADALAMENTI:  So we'll pause then and
16 call the Court.
17    MS. BRAULT:  Sure.
18    MS. BADALAMENTI:  Okay.  Let's do that.
19    THE VIDEOGRAPHER:  Off the record at 10:42.
20       (Break in proceeding taken from
21        10:42 a.m. to 10:53 a.m.)
22    THE VIDEOGRAPHER:  We are back on the record
23 at 10:53 a.m.
24 BY MS. BADALAMENTI:
25 Q  So I don't remember my last question verbatim.

Page 37

1     MS. BRAULT:  Why did you resign.
2  BY MS. BADALAMENTI:
3  Q  Yeah.  And so my -- my question was related to the
4     circumstances of your resignation, and I understand
5     that you've declined to answer that question --
6  A  Yes.
7  Q  -- right?
8     Okay.  And any follow-up question about the -- the
9     nature of your resignation, the terms of your
10    resignation, any severance package you received, all of
11    that, you would give me the same response; is that
12    fair?
13 A  Yes.
14 Q  Okay.  Any performance issues that led to your
15    resignation, any disciplinary issues during your
16    employment, would you give me the same response?
17 A  Yes.
18 Q  Okay, fair enough.
19    MS. BRAULT:  Hold on one second.
20    MS. BADALAMENTI:  Yep.
21    MS. BRAULT:  Let's take a break, yeah.
22    THE VIDEOGRAPHER:  Okay.  Going off the
23 record at 10:54 a.m.
24       (Break in proceeding taken from
25        10:54 a.m. to 10:57 a.m.)

Page 38

1 THE VIDEOGRAPHER: We are back on the record
2 at 10:57.
3 BY MS. BADALAMENTI:
4 Q Okay. So as I understand there was an off-the-record
5 discussion, and you are now prepared to tell me whether
6 or not there were any -- whether or not you were ever
7 counseled or disciplined in the course of your
8 employment at PharmaCo?
9 A Yes.
10 Q And were you?
11 A I was never counseled or disciplined.
12 Q Were you ever written up?
13 A No.
14 Q Do you have a personnel file there at PharmaCo?
15 A No.
16 Q Have you ever requested a copy of your personnel file?
17 A No.
18 Q After your employment at PharmaCo, what did you do for
19 that six month time period before you took a job at
20 JARS?
21 A After?
22 Q Yep.
23 A It was in six months.
24 Q I thought it was October through March.
25 A That's not six months.

Page 39

1 Q Sorry. I did law school because I can't do math.
2 A Okay.
3 Q So was it five months?
4 A Yeah, it was in October.
5 Q Okay.
6 A Yeah, I was not working at the time. If I had work, it
7 was through those attorneys that I listed earlier doing
8 research and writing, that kind of work as it came
9 about. I think I did maybe one or two doc review
10 projects that came around because it was available to
11 me, but for the most part I did not.
12 Q Okay. Whose idea was it that you resigned, the
13 employers or your own?
14 A I can't answer that.
15 Q The -- didn't you collect unemployment?
16 A Yes.
17 Q How did you collect unemployment if you were resigned
18 from PharmaCo?
19 A That's just -- when I called unemployment and they said
20 to do -- I gave them the information of the
21 circumstances with PharmaCo, and that's just how it
22 went.
23 Q So you were able to tell unemployment the
24 circumstances --
25 A Yes.

Page 40

1 Q -- that you're not telling me here?
2 A Bare minimum.
3 Q What did you tell unemployment?
4 A I can't discuss that because that would go into the
5 agreement.
6 Q But you told already a public agency. So what -- my
7 question is not what's in the agreement. My question
8 is what did you tell the public agency in order to
9 secure unemployment benefits?
10 A I don't know -- I can't tell you that. I don't know.
11 Q You don't know or you can't tell me?
12 A I don't recall.
13 Q Okay. So didn't you fill out unemployment
14 applications --
15 A Uh-huh.
16 Q -- to receive unemployment benefits?
17 A Yes.
18 (Exhibit 1 marked for identification)
19 BY MS. BADALAMENTI:
20 Q Okay. I've marked as Exhibit 1 a Monetary
21 Determination from the State of Michigan, Department of
22 LARA.
23 A Yes.
24 Q Sorry, the Department of Labor and Economic Opportunity
25 Unemployment Insurance Agency.

Page 41

1 A Yes.
2 Q It's dated January 23, 2020. Do you see that?
3 A Yes.
4 Q Okay. This says that you did not resign from PharmaCo,
5 but you were fired.
6 A Okay.
7 Q Is that what you told them?
8 A I don't recall if that's what happened. I really
9 don't.
10 Q Well, when you got this in the mail, this went to you
11 at your Orchard lake address in West Bloomfield, right?
12 A When did this go?
13 Q Mailed to you January 23, 2020.
14 A Yeah, I don't recall this document. I really don't.
15 Q When did benefits start?
16 A I don't recall it. It would -- you'd have to look at
17 the sheet. I don't remember.
18 Q So when you received communications from the State of
19 Michigan that said PharmaCo, separating employer fired,
20 did you ever file any written objection to tell the
21 unemployment agency that they had it wrong? That you
22 actually weren't fired, you resigned?
23 A I believe I told them that I resigned from the
24 beginning. I did say that I believe. I can't recall
25 because of the time it's been. I remember being on

Page 42

1 unemployment for a short period of time, but I don't
2 recall the conversation or the details that I had with
3 the unemployment agent at that time.
4     I remember that it was something that took a while
5 to get situated. I do remember that, but I don't
6 recall everything that happened in that conversation,
7 or what was said, or how they put things in there. I
8 pay no attention to what they put in this information
9 here because I just really just didn't.
10 Q  Do you understand the penalties for --
11 A  I --
12 Q  -- reporting false statements --
13 A  -- I didn't report a false statement --
14 Q  -- hold on, hold on, hold on.
15     Do you understand the penalties for reporting
16 falsely to the Unemployment Insurance Agency?
17 A  Yes.
18 Q  Okay. The -- was there a particular agent at the
19 Unemployment Insurance Agency that you remember
20 speaking to?
21 A  No.
22 Q  Do you remember writing any letters or giving any
23 written documentation other than this that came to you?
24 A  I don't recall.
25 Q  Do you remember receiving any other notices other than

Page 43

1 your weekly benefit checks from the Unemployment
2 Insurance Agency?
3 A  I don't recall.
4 Q  Okay. And you don't remember writing a letter, though,
5 to clarify that you were not actually fired from
6 PharmaCo?
7 A  I don't remember. I really don't recall it. I
8 don't -- no.
9 Q  Okay.
10 A  I don't know the answer to that.
11 Q  The -- prior to PharmaCo where were you working?
12 A  I was doing -- working at Trustpoint, which was Kelly
13 Services. So it's on here so that's correct.
14 Q  Okay. So Kelly Services now called Trustpoint
15 International, LLC, right?
16 A  Yes.
17 Q  Okay. I didn't even know that they changed the name.
18 Kelly Services has been around forever.
19 A  They're still around.
20 Q  Okay. So Kelly -- was it legal resources that you were
21 doing, legal work?
22 A  They took the legal doc review part and sold it to
23 Trustpoint. Kelly Services still exists.
24 Q  Okay.
25 A  So they branched off to Trustpoint.

Page 44

1 Q  Okay, got it. So the work that you were doing for
2 Kelly Services, was it only legal work?
3 A  Doc review.
4 Q  Doc review related to legal matters or something --
5 A  Yes.
6 Q  -- else? Okay.
7     And I have here in your resume you did that from
8 July of '17 to May of '19; is that correct?
9 A  Yes.
10 Q  And was that full time?
11 A  No, it was -- it was a two-week project, stop.
12 Two-week project, stop. Then I go three, four weeks
13 maybe sometimes without a project, then they'd call me
14 back for a project. It was sporadic work.
15 Q  Was it full time when you were working?
16 A  Yes.
17 Q  Do you remember what you made annually?
18 A  No.
19 Q  For PharmaCo, what were you making?
20 A  65,000 a year.
21 Q  Any benefits?
22 A  Yes.
23 Q  What benefits?
24 A  Health insurance --
25 Q  Did that include vision and dental?

Page 45

1 A  -- vision and dental.
2 Q  Any other benefits?
3 A  That's it.
4 Q  Any paid time off, paid vacations, paid holidays?
5 A  Yes.
6 Q  Was there a 401(k)?
7 A  No.
8 Q  Any car allowances? Anything like that?
9 A  No.
10 Q  Cell phones?
11 A  No.
12 Q  Were you issued a work computer from PharmaCo?
13 A  Yes.
14 Q  Like a laptop that you could take to and from?
15 A  Yes.
16 Q  Was PharmaCo work that you did there, or did you work
17 remotely?
18 A  Both.
19 Q  Okay. About how many weeks -- how many hours per week
20 were you there in person?
21 A  I can't say for sure the hours because I could go to a
22 facility and have to work there. I could go -- I could
23 have to work from home. I don't know.
24 Q  How many compliance specialists were there when you
25 were employed at PharmaCo as a compliance specialist?

Page 46

1  A   There was one other person that was there, but I think
2      she just started working in a different area of the
3      company.
4  Q   What was her name?
5  A   Julia -- I don't remember -- Oh, Nunez, N-U-N-E-Z.  I
6      think that's how you spell her name.  Yes.
7  Q   Do you know if she's still there?
8  A   She is not.
9  Q   How about Katrina Cotton, is she still there?
10 A   She is not.
11 Q   How do you know that?
12 A   Katrina?
13 Q   From -- either one of them.
14 A   I just -- from other people have told me she -- they
15     are not there anymore.
16 Q   And who do you still talk to that worked with you at
17     PharmaCo?
18 A   None of the people that I work with at PharmaCo that I
19     talked to -- I don't talk to anybody at PharmaCo
20     anymore.
21 Q   Who do you talk to that you worked with at PharmaCo?
22 A   I've talked to Katrina Cotton.  That's it.
23 Q   Okay.  When's the last time that you talked to Katrina?
24 A   It's been a couple of months.
25 Q   Where does Katrina live?  In Michigan?

Page 47

1  A   Yes.
2  Q   Do you know what city?
3  A   Shelby Township, Clinton Township, I believe.
4  Q   Do you know where she's working?
5  A   I don't know the name of the company.
6  Q   Do you know the circumstances that led her to leave
7      PharmaCo?
8  A   I can't -- I don't know.
9  Q   Did she leave before or after you?
10 A   After.
11 Q   So that wouldn't be subject to any agreement that you
12     have with PharmaCo, right?
13 A   I don't know why she left.
14 Q   Okay.  You never asked her?
15 A   I -- I don't recall asking her that question.  You'd
16     have to talk to her about that.  I don't know.
17 Q   How about Julia?  Did you ever ask Julia why she left?
18 A   I don't talk to Julia.
19 Q   Have you since you left PharmaCo?
20 A   No.
21 Q   The -- did you, while employed at PharmaCo, issue any
22     written request to modify your job duties or any
23     complaints about the scope of your work to anyone there
24     in HR, or any manager, or any owner?
25 A   I think that's asking questions -- I don't think I can

Page 48

1      answer that one either.
2  Q   Okay.
3  A   I think that's in the agreement where I can't disclose
4      a lot of this stuff.
5  Q   You can't disclose things that you complained about?
6  A   I can't disclose those things.
7  Q   Okay.  But those things did occur?
8  A   I am not going to disclose yes or no, or say yes or no
9      that those things occurred.
10 Q   Okay.
11         MS. BRAULT:  I'm just going to place an
12     objection too for the record that you're requesting
13     proprietary information that is subject to a protective
14     agreement or an NDA about PharmaCo's policies and
15     procedures, and that's the basis for the objection.
16 BY MS. BADALAMENTI:
17 Q   The -- at any point did you provide any severance
18     letter or other notice from PharmaCo to the
19     Unemployment Insurance Agency?
20 A   I don't recall.  I don't remember.  I'd have to -- I
21     don't remember if that happened or not.  I remember
22     speaking to an agent regarding my case.  It's possible
23     I've provided it.  I don't know.
24 Q   Were you asked whether there was any severance package?
25 A   I don't remember.

Page 49

1  Q   If you would have been asked if there was a severance
2      package, would you have provided that information to
3      the insurance agency?
4  A   If I had to provide something of that nature, I would
5      have let Katrina know who's the HR person at PharmaCo
6      because I believe that's the conditions with that.  If
7      I have to disclose something like that for that
8      particular issue of unemployment, I would have had to
9      let them know that that was what was happening.
10 Q   Do you remember having to do that?
11 A   I don't -- I don't remember.
12 Q   Okay.
13 A   I can't recall offhand what happened with the
14     circumstances surrounding that.
15 Q   The unemployment determination letter that we've marked
16     as Exhibit 1 approves you for unemployment benefits for
17     a one-year period.
18 A   Uh-huh.
19 Q   How long did you receive those benefits?
20 A   For PharmaCo as in?  Is that what you're asking for
21     that?  Okay.
22 Q   Yes, this particular account.
23 A   I believe it was only for -- I think it was January to
24     March when I got the position at JARS.  That's it, yes.
25 Q   As a condition of receiving unemployment benefits were

Page 58
1  either self-employed or by someone else, and if you say
2  yes you disclose exactly how much you got paid that
3  work. I disclosed that when I certified every time I
4  worked. If I worked for contract for one of the
5  attorneys, I disclosed how much I got paid --
6  Q   And so --
7  A   -- and that money was deducted.
8  Q   So we'll see that in your portal entries?
9  A   Yes.
10         MS. BADALAMENTI: Okay. All right. Let's
11  mark this as Exhibit 2 just so we have a clean record.
12         (Exhibit 2 marked for identification)
13  BY MS. BADALAMENTI:
14  Q   That is a resume that we've marked as Exhibit 2 that
15  you produced to us. Have you updated that resume at
16  any point since producing it to us?
17  A   I believe I have added the Consilio onto it. Yes.
18         MS. BADALAMENTI: Okay. So we'll ask for a
19  copy of the updated resume, please.
20         Can you make a note of that?
21  BY MS. BADALAMENTI:
22  Q   Okay. When you took the position with PharmaCo, had
23  you worked for any other cannabis employer prior to
24  that?
25  A   No.

Page 59
1  Q   What sort of training did you receive in the position
2      at PharmaCo?
3  A   I didn't receive -- well, let me think. Very little.
4      I only received training as far as how to use the MRA
5      portal to upload the applications, and what is required
6      to be in the applications from Julia Nunez. She showed
7      me the process of what paperwork needed to be done, and
8      showed me a sample of what needed to be produced for
9      them, and gave me access to what she was looking for,
10     and what the state was looking for. And after that I
11     did the rest of the stuff on my own.
12  Q   Do you currently take any medications on a regular
13      basis?
14  A   Yes.
15  Q   What do you take?
16  A   I take Synthroid. Do you need the dosage amount?
17  Q   No.
18  A   Take Synthroid. I take vitamin D. I take Adipex. I
19      take Metformin. I take trazodone. I take Protonix,
20      and I believe that is it currently that I am taking.
21  Q   When did you start taking Synthroid?
22  A   I've been taking Synthroid since I was 14, 15 years
23      old. I believe at 14 years old.
24  Q   And vitamin D?
25  A   Vitamin D probably about four or five months ago.

Page 60
1  Q   Who prescribes it?
2  A   The vitamin D?
3  Q   Yep.
4  A   Dr. Schoeffer. He's my internist/thyroid doctor.
5  Q   Can you spell it?
6  A   S-C-H-O-E-F-F-E-R.
7  Q   In what city?
8  A   Farmington.
9  Q   Okay. Who prescribes the Adipex?
10  A   Dr. Shannon Webster.
11  Q   Where is Dr. Webster located?
12  A   Southfield.
13  Q   How long have you been on Adipex?
14  A   I don't recall when I started. It's been an off-and-on
15      thing that I've taken Adipex.
16  Q   For weight loss or for something else?
17  A   It is for weight loss, and I need to correct you.
18      Schoeffer's office is in Southfield. My apologies.
19  Q   Okay. What type of doctor is Dr. Webster?
20  A   She is my primary care doctor.
21  Q   Have you received an Adipex prescription from anybody
22      besides Dr. Webster?
23  A   No.
24  Q   The metformin, what do you take that for?
25  A   I have PCOS.

Page 61
1  Q   What's that?
2  A   Polycystic ovarian syndrome.
3  Q   Okay. And how long have you been taking metformin?
4  A   For -- it's been about a year I believe now.
5  Q   And who prescribes that?
6  A   Dr. Shannon Webster.
7  Q   Trazodone, what do you take that for?
8  A   I take that for my anxiety.
9  Q   How long have you been taking that?
10  A   I've been taking it for about -- I want to say a month
11      now. A month or so.
12  Q   Who prescribes it?
13  A   Dr. Harris.
14  Q   Where's Dr. Harris located?
15  A   He's at New Oakland, I believe, Family Counseling
16      Center. I believe that's the name of it. He's my
17      psychiatrist.
18  Q   And when did you start seeing Dr. Harris?
19  A   I started seeing him -- it was 30 days ago I started my
20      first session with him.
21  Q   Prior to Dr. Harris had you treated with anyone for
22      anxiety or depression or any sort of mental health
23      care?
24  A   Yes.
25  Q   With whom?

Page 66

1   A   No.
2   Q   Any substance abuse hospitalizations?
3   A   No.
4   Q   All right. So your employment at JARS, March to July
5       of 2020, tell me what -- what position were you hired
6       into.
7   A   Compliance officer.
8   Q   What did you tell JARS about your prior employment
9       history?
10  A   Can you be specific?
11  Q   Yeah. What did you -- where did you tell them that you
12      had been working immediately before taking that
13      position?
14  A   PharmaCo.
15  Q   Did you tell them that you were on unemployment?
16  A   No.
17  Q   Did you tell them that you had been -- that you had
18      resigned or been fired, as the case may be, from
19      PharmaCo in October and actually not working for five
20      months --
21  A   No.
22  Q   -- at that point?
23      Did you tell them that you had a confidentiality
24      agreement with PharmaCo?
25  A   I told them that I couldn't discuss what I did in work

Page 67

1       at PharmaCo for, you know, business reasons as well,
2       which is true. There are trade secrets that I can't
3       discuss of how things go. That question was asked in
4       the interview about certain policies or things that
5       they do there, and I told him I couldn't disclose it.
6   Q   So my question is whether or not you told them that you
7       had a nondisclosure term in the severance agreement
8       that you had with PharmaCo?
9   A   No.
10  Q   Did you tell them that there was a severance agreement
11      or resignation --
12  A   No.
13  Q   -- agreement of any sort?
14  A   No.
15  Q   Okay. How about the contract work, what did you tell
16      them about your contract legal work? Did you tell them
17      you were still doing it or --
18  A   They didn't ask me. I don't recall them asking me
19      about that.
20  Q   Did you provide a resume?
21  A   Yes, I did.
22  Q   Was it this resume that I put in front of you or
23      something different?
24  A   This looks like the one I provided them. I'm not sure.
25      It's probably not because it says the date that I was

Page 68

1       terminated on this one.
2   Q   And it wouldn't have said that on the one that you
3       provided?
4   A   Correct.
5   Q   Okay. Why not?
6   A   Because I was -- I wouldn't put JARS on here. I wasn't
7       working for them. You asked me about JARS. I wouldn't
8       put my -- that I worked for JARS on there.
9   Q   Okay. I'm going to show you another version of a
10      resume that was produced in discovery. Can you tell me
11      by looking at this document when this one was created?
12  A   I don't know when it was created, but this looks like
13      the one I sent to JARS. I can't tell you the date of
14      when it was created or what time frame it was.
15          MS. BRAULT: Do you have a copy, please?
16          MS. BADALAMENTI: Yep.
17          THE WITNESS: I don't know.
18          MS. BADALAMENTI: Okay. We'll mark it as 3.
19      (Exhibit 3 marked for identification)
20  BY MS. BADALAMENTI:
21  Q   Exhibit 3 changes the title from Exhibit 2 of what
22      position you actually held at PharmaCo. I think. Oh,
23      no, sorry, compliance specialist.
24      Other than adding in the JARS employment, were
25      there any other changes to this document that you

Page 69

1       remember making before you sent it to JARS?
2   A   I don't recall making any different -- any changes
3       other than this. I don't -- I don't believe I did.
4   Q   So one thing that you weren't sure about was your
5       employment at LegalEase. You thought that that ended
6       in May because you couldn't do the work while you were
7       working at PharmaCo, but I notice here in Exhibit 3 it
8       actually says LegalEase October 2017 to present.
9   A   Where?
10  Q   Page 2 of this document up at the top. So at least
11      when you sent this out you were still working at
12      LegalEase; is that right?
13  A   Yeah, I don't remember -- I probably just didn't update
14      it. It's not -- it's probably an oversight. I -- I
15      didn't do it intentionally to say that I was still
16      working with them. It just was something because --
17      I -- I didn't do it intentionally. I didn't know.
18  Q   So -- but it is your belief that you were not still
19      working --
20  A   I don't believe I was --
21  Q   -- for LegalEase?
22  A   -- yeah, I don't believe I was. I can't remember. As
23      I stated before, I can't recall the dates that I
24      stopped doing actual projects for LegalEase.
25  Q   Okay.

Page 110
1 talked and discussed about washing hands and wearing
2 masks and social distancing. Because we were in an
3 office where it was a building where other companies
4 were in it, and so they wanted to make sure because
5 there was people coming in and out of the building and
6 people were safe. I think everybody chimed in on that
7 particular matter on what needed to be done and what we
8 were going to do.
9 Q Was there general agreement on -- on return to the
10 office protocol?
11 A Yes.
12 Q And were you in charge of putting that agreement on
13 what the protocols would be into writing in some way
14 for corporate?
15 A For corporate, I can't recall. I think -- if I recall
16 correctly, I created just a blanket, like, protocol for
17 COVID-19, like a training protocol I did, but I don't
18 remember if it was one specific for corporate. I think
19 with corporate we just kind of understood these were
20 the things we were going to do.
21 Q Okay. And the -- when you were working from home, were
22 there progress reports or anything that you had to
23 provide to update the team on what you're working on?
24 A We did that every Wednesday, and then I responded by
25 emails. I gave them emails about what I was working

Page 111
1 on, and when I finished them I kept communication. If
2 they gave me a list and said I need you to create this
3 kind of policy, I will work on the policy and finish
4 it. Give them a draft of it to review depending on
5 who -- who it was. We might have a meeting after to
6 discuss. I like this, take this out, move this around,
7 but I kept an open line of communication of what I was
8 working on. Anybody can call me and ask me what I was
9 doing, and I can tell them and show them.
10 Q Okay. So the -- you said we had those discussions on
11 Wednesdays. Was there some actual, like, written
12 agenda or progress report or something like that that
13 you were supposed to provide before those Zoom
14 meetings?
15 A Sometimes we had an agenda, and it depended on -- I
16 don't remember who would create it or what we would
17 discuss. Sometimes it was Raymond and Kelsey that will
18 create something, but generally it was like a round
19 robin type of thing. Raymond would go and say, well,
20 Shamara, what are you working on, and I'd go and give
21 detailed information.
22     And he would tell me, okay, so can you get this by
23 Wednesday. Can you give me this by Thursday. If other
24 people needed something from me at that time, I would
25 provide it as well. If they needed it in a specific

Page 112
1 time frame, I would, you know, write that down and give
2 that to them, and then I would email a draft here.
3 Here's a draft of this you were looking for. Here's
4 this you were looking for.
5 Q Okay. You said that there were also times even when
6 you were working remotely where you had to go to an
7 inspection at a facility, right?
8 A Yes.
9 Q Okay. Did -- did any of those inspections go poorly?
10 Did they fail?
11 A There were two that I recall in specific that didn't
12 pass.
13 Q Okay. Which two were those?
14 A I believe it was Lansing and Owosso that didn't pass.
15 Q And what is the time frame? Do you remember what
16 month?
17 A I don't remember the month.
18 Q And why did they fail?
19 A They failed because of paperwork that Mandy was
20 supposed to submit was not submitted properly. It
21 wasn't because of the field work that I did, the
22 inspection part, the field inspection.
23 Q So what's -- what paperwork specifically was submitted
24 incorrectly?
25 A She incorrectly submitted a floor plan. So a floor

Page 113
1 plan must be actually true to what is happening, and
2 that's something I didn't have access to. I didn't
3 even have access to upload the applications. So I
4 submitted the floor plans -- she submitted the floor
5 plans, and they did construction, and when you do
6 construction you have to update that floor plan and
7 send it over to MRA, and she did not do that. I was
8 under the assumption that part was taken care of by
9 her.
10 Q Okay. And so the floor plans go to MRA. I thought
11 that you said that you were the one that was dealing
12 with the regulatory agencies?
13 A That's correct for the field inspection --
14 Q Okay.
15 A -- but like the application process, she handled that.
16 Q Okay.
17 A Yes.
18 Q Are you preparing any of the documents that go into
19 that application?
20 A Not for JARS, no.
21 Q Okay. Did you do that for somebody else?
22 A I did that for PharmaCo.
23 Q Okay. And not for JARS?
24 A No.
25 Q At any point did you do that for JARS?

Page 166
1  That would be the opportunity in the industry that
2  you wanted to go into, right?
3  A  Correct.
4  Q  Okay. And you tell him, God bless, right?
5  A  Yes.
6  Q  All right. Was there any response to that?
7  A  No.
8  Q  Okay. Were you approved for unemployment?
9  A  Yes.
10 Q  What did you receive, do you remember?
11 A  I do not because it was in the middle of the pandemic
12    so the amount was different. I don't remember.
13 Q  Okay. So let's just mark this. I think it's 8.
14    Did I give you one?
15    And then I think I'm done, and I'll let you --
16    MR. SARCONI: We're going to take a break --
17    MS. BADALAMENTI: Take a break, yeah. Here's
18 eight.
19    MR. SARCONI: -- for lunch as long as Darcie
20 would like, and then we'll return for a brief --
21    THE VIDEOGRAPHER: Okay. We're going off the
22 record at 1:23 p.m.
23    (Break in proceeding taken from
24    1:23 p.m. to 2:30 p.m.)
25    THE VIDEOGRAPHER: We are back on the record

Page 167
1  at 2:30 p.m.
2    MR. SARCONI: Good afternoon, Ms. Boines. My
3  name is James Sarconi. I represent Raymond Abro in
4  this lawsuit. Is it all right if I call you Shamara?
5    THE WITNESS: Sure.
6    MR. SARCONI: Okay. I'm going to ask you
7  some questions. The same rules, the same format
8  applies to my questions as were conducted earlier.
9  Most important is the one where we try to not speak
10 over each other, and I'm going to try to pat myself on
11 the back and do a better job than Raechel is with not
12 speaking over you.
13    ** ** ** ** **
14    E X A M I N A T I O N
15 BY MR. SARCONI:
16 Q  Earlier we talked about -- or you talked with Raechel
17    about contract work that was done with various
18    attorneys. In each one of those instances were you
19    issued a 1099 by -- by those lawyers?
20 A  No.
21 Q  Okay.
22 A  I -- do you want me finish?
23 Q  Yes.
24 A  Okay. So some of the lawyers did not give me the 1099.
25    However, I filed the taxes on them. I kept a count of

Page 168
1  what was what. I'm sure they kept their own records.
2  I don't know, but I filed taxes on it with a 1099.
3  Q  Did -- with each one of them -- and I don't want to go
4  through every single name. I remember a few,
5  Saperstein --
6  A  Uh-huh.
7  Q  -- Morgan --
8  A  -- yes.
9  Q  -- Vasquez (ph) --
10 A  Yes.
11 Q  -- did they pay you by check or did anyone pay you with
12    cash?
13 A  Vasquez I just started this year so I haven't gotten a
14    1099 with her. I just literally started working with
15    her. They did Cash App or Venmo or they would just --
16    I had a QuickBooks set up so they can just hit the pay
17    button and pay through a credit card.
18 Q  Okay. Homeland Security. I think you testified that
19    you externed with Homeland Security; is that correct?
20 A  Yes.
21 Q  Okay. Did you -- after completing the externship and
22    after sticking around, did you ever inquire about
23    employment with them once you finished your master's?
24 A  No. I had to get a license to do that.
25 Q  As -- I'm sorry, you need --

Page 169
1  A  As an attorney --
2  Q  -- oh, okay.
3  A  -- yeah. Yes.
4  Q  There wasn't any other -- were there any positions
5    within Homeland Security that you were interested in
6    that didn't require a P number?
7  A  Not that I recall.
8  Q  You were interviewed twice by JARS prior to being
9    offered employment; is that correct?
10 A  Yes.
11 Q  Okay. How far apart were those interviews, do you
12    remember?
13 A  I do not.
14 Q  Okay. During those interviews were you asked questions
15    about your former employment with PharmaCo?
16 A  Yes.
17 Q  Okay. And did you tell JARS that you left PharmaCo
18    because you were unhappy with all the city and state
19    visits you had to make?
20 A  I don't recall the reason.
21 Q  Okay. Did they ask you? Do you recall them asking you
22    a specific reason?
23 A  I don't recall the reason.
24 Q  ==Did you receive a termination letter from PharmaCo?==
25 A  ==I don't think I can answer that question. I think I==

Page 170
1   can't.
2  Q  The answer is you're --
3  A  I can't answer that question.  The discussion --
4  Q  For clarity, it's just that you can't and will not,
5     that's all I want to get clear with you.
6  A  I will not answer that question.
7  Q  Okay.
8        MS. BRAULT:  I'm sorry, what was the
9     question?  I was --
10       MR. SARCONI:  If she was issued a termination
11    letter by PharmaCo.
12       MS. BRAULT:  Yeah.
13 BY MR. SARCONI:
14 Q  While you were employed with Pharmaco, did you contact
15    the Secret Service for any reason?
16 A  Can I have a second?  Confer with --
17 Q  There's a question pending so she can provide an
18    objection --
19 A  -- I don't know the answer to that.  I need to take a
20    break.
21 Q  Okay.
22 A  Okay.
23       MR. SARCONI:  That's fine.  We'll take a
24    break.
25       THE VIDEOGRAPHER:  Going off the record at

Page 171
1   3 -- 2:34 p.m.
2        (Break in proceeding from
3        2:34 p.m. to 2:37 p.m.)
4        THE VIDEOGRAPHER:  We are back on the record
5     at 2:37 p.m.
6        MS. BRAULT:  Okay.  I just want to -- I sort
7     of am making a belated objection and ask for a
8     clarification, and somewhat by way of explanation.
9        Ms. Boines is sort of struggling with what
10    she can or cannot say legally because of the agreement
11    that she signed and she agreed to and, you know, she
12    can't speak to the circumstances surrounding her
13    departure for PharmaCo, and she can't speak to policies
14    and procedures that could be considered proprietary
15    with respect to PharmaCo particularly in light of the
16    fact that it's a competitor to JARS.
17       But I think a question that you could ask and
18    that she could answer would be did you -- are you
19    asking her if she complained to Secret Service or if
20    she had some contact with Secret Service?
21       MR. SARCONI:  Well --
22       MS. BRAULT:  Or both?
23       MR. SARCONI:  -- both.  Both.
24       MS. BRAULT:  I think she can say that she --
25    I think she can answer the question about whether or

Page 172
1   not she complained about anything to Secret Service,
2   but beyond that I think then we're getting into sort of
3   proprietary processes and procedures.
4        MR. SARCONI:  Okay.
5        MS. BRAULT:  So...
6        MR. SARCONI:  I'll take it.
7  BY MR. SARCONI:
8  Q  I'll ask that question.
9      Did you complain to the Secret Service while you
10    were employed at PharmaCo?
11 A  No.
12 Q  Okay.  Did you send any emails while you were employed
13    at PharmaCo that had to be retracted for any reason?
14 A  I don't know.
15 Q  Okay.  Did you tell HR at PharmaCo that you were fired
16    for being black?
17 A  No.
18 Q  Who's Julia Nunez?  Do you know that person?
19 A  Yes.
20 Q  Who is she?
21 A  I worked with her at PharmaCo.
22 Q  Do you know what her title was?
23 A  Yeah.  I think it was another compliance specialist, or
24    it might have been director of compliance when I left.
25    I don't know.

Page 173
1  Q  Okay.  Do you know if PharmaCo is still called
2     PharmaCo?  Does it have a new name or something?
3  A  I believe it's Red White & Bloom.
4        MR. SARCONI:  Okay.  What number were we on?
5        MR. PETRUS:  Nine.
6        MR. SARCONI:  Thank you.  We'll mark this as
7     Exhibit 9, Darcie.  We can make that the witness copy.
8        (Exhibit 9 marked for identification)
9        MR. SARCONI:  Let the record reflect that I
10    placed in front of the witness what we're marking as
11    Deposition Exhibit No. 9.  Two pages at the bottom
12    Bates stamped ending in 585 and PL586.
13 BY MR. SARCONI:
14 Q  Shamara, take a minute, obviously, to take a look at
15    this, and then I'll ask you a question.
16 A  Yes.
17 Q  Have you seen this declaration before?
18 A  Yes.
19 Q  Okay.  Did you assist in preparing the declaration that
20    we're looking at it as Exhibit 9?
21 A  No.
22 Q  Okay.  Were you present when Katrina Cotton signed this
23    declaration?
24 A  No.
25 Q  Did you request that Katrina Cotton sign this

Page 174

1 declaration?
2 A   No. I don't recall asking her to sign the declaration,
3 no.
4 Q   Okay. Did you have any conversations with Ms. Cotton
5 discussing the -- the statements made in this
6 declaration?
7       MS. BRAULT: I'm just going to place an
8 objection to form. There are a lot of statements in
9 there.
10 BY MR. SARCONI:
11 Q   Did you -- that's fair.
12      Did you have any discussion with Shamara -- I'm
13 sorry, Shamara. So let's strike all that.
14      Did you have any discussions with Katrina about
15 whether or not she would be signing a declaration to be
16 used in this lawsuit?
17 A   Yes, after she agreed to it.
18 Q   Okay. And what did you discuss with her?
19 A   She just told me that she had spoken with my attorneys,
20 and that she was going to write something. And that
21 was the pretty much the extent of it the last time I
22 talked to her about it.
23 Q   Did you have any independent understanding as to why
24 she was writing or signing a declaration?
25 A   I knew why she was signing and writing the declaration,

Page 175

1 what it was about, briefly, but I didn't know all of
2 the contents. No.
3 Q   And what was your understanding of why she was signing
4 a declaration?
5 A   As far as my employment at PharmaCo, if I had any
6 issues because she was the HR person, and that was
7 about all I know that was going to be discussed. I
8 wasn't there when she had the conversations with my
9 attorneys.
10 Q   Okay. And Katrina was the HR, the head of HR, at the
11 time that you were working at PharmaCo?
12 A   Yes.
13 Q   I think you testified that you assisted in the
14 preparation of a human resource -- or strike that.
15      An employee handbook for JARS; is that accurate?
16 Assisted in the preparation of a --
17 A   Yes.
18 Q   -- new employee handbook?
19 A   Yes.
20 Q   Okay. Did you start from a particular template?
21 A   I believe I had an old employee handbook of my own from
22 somewhere else that I was -- given to me that was just
23 sitting somewhere in my own arsenal just to see the
24 format of an employee handbook. So I knew, like, the
25 process of what goes where to just get an idea. And I

Page 176

1 believe Raymond gave me a copy of an old handbook
2 for -- at the time it was known as D3 -- now JARS
3 Detroit to look at. I think that was one of them, and
4 there might have been another facility he gave me to
5 look at the language and the things that he wanted in
6 the new employee handbook and I used that.
7 Q   Okay. When you began working for JARS, did you have
8 any understanding as to whether someone had been
9 performing compliance work at JARS before you got
10 there?
11 A   Very little. I know that there was someone before. I
12 don't know the reasons of why that person left or who
13 that person was. I think I heard they went to a
14 different competitor, but that was it. Very little was
15 told of me -- to me rather.
16 Q   How did you come to be introduced or first interact
17 with Taft, and in particular Heather Jackson?
18 A   It started with John Kenny, who is also an associate at
19 Taft. I had to interact with him as far as -- I think
20 it was an NDA or some sort, or an agreement that
21 Raymond needed written. And so when Raymond would give
22 me tasks such as that -- because I'm not a licensed
23 attorney -- I would just kind of put what he wanted on
24 a piece of paper very neatly, and then I discussed it
25 with John Kenny and explain to him, listen, I'm not a

Page 177

1 licensed attorney. I can't give legal advice or
2 anything, but what I can do is put the information that
3 Raymond wants for this particular document and I will
4 email it to you. You can do the edits and put the
5 legal information that's supposed to be in it, and I
6 will work with you to make sure we get the document how
7 it's supposed to be. And it started with him with
8 those documents.
9      When I needed assistance on the employee handbook,
10 that was when John Kenny said that we needed to go and
11 talk to Heather Jackson because she was the employee --
12 person that knew employment law, and was the expert on
13 that. So that's how I started working with her.
14 Q   Okay. And so -- or strike that.
15      Were you given Taft's information or did you seek
16 out Taft as the attorney to consult with?
17 A   I sent the email that I needed assistance with the
18 employee handbook, if I recall correctly, to John
19 Kenny, and then he copied Heather Jackson. So maybe
20 they had a sidebar discussion about Shamara's going to
21 be contacting you because of the employee handbook that
22 needs to be done. And then he began to Cc her on that,
23 and then eventually it was he was Cc'd, but he didn't
24 say very much on the -- on the matter. It was mainly
25 her.

Page 178
1  Q  Okay. And I apologize. I think my attempt to be
2     artful my question is missing the mark, and so this is
3     on me.
4        Did JARS already have an existing relationship
5     with Taft or did you on behalf of Taft -- I'm sorry --
6     you on behalf of JARS hire Taft?
7  A  They had a --
8        (Indiscernible crosstalk.)
9        THE WITNESS:  -- oh, they had an existing
10    relationship.
11 BY MR. SARCONI:
12 Q  Okay. So someone over at JARS said here's our attorney
13    to talk to on things that are -- that require an
14    attorney?
15 A  Right.
16 Q  Okay. And who was that? Was that Raymond or someone
17    else at the office?
18 A  No. I believe, if I'm correct, the information came
19    from -- he went by the name Junior. I guess his name
20    is Hani Kassab. He's one of the other individuals that
21    handles JARS, and that was someone that he knew or had
22    been working with.
23 Q  Okay. Did you ever get into any heated arguments with
24    any coworkers at JARS?
25 A  Not that I recall.

Page 179
1  Q  Okay. Did you ever get into any heated arguments with
2     coworkers at PharmaCo?
3  A  I don't recall heated arguments. It might be just
4     office disagreements, but nothing heated where -- you'd
5     have to define what you mean by heated.
6  Q  Like yelling, screaming.
7  A  Not that I recall.
8  Q  Okay. Was there any specific discussion between you
9     and anyone else at JARS about Heather Jackson's
10    participation with the JARS employee handbook?
11 A  Yes.
12 Q  Other than what we've already talked about. What --
13    what you and Raechel talked about?
14 A  Yes.
15 Q  Okay. Can you tell me what those discussions were?
16 A  It was with Kelsey Lang.
17 Q  Okay. And what --
18 A  I was getting very irritated with Ms. Jackson's
19    performance as far as continuously putting MRA policies
20    into the handbook that were either inaccurate or we had
21    already discussed with her, Raymond, and I on a
22    conference call that we did not want her to touch any
23    of the Michigan Regulatory Agency employee information
24    for the purpose of -- she admitted to me that she
25    didn't know anything about it, and she was just

Page 180
1     guessing or asking a colleague. And it was from my
2     understanding Taft's office is in Illinois. Those are
3     different rules and regulations.
4        So she said she had just asked someone that was
5     familiar with cannabis law, and she really wasn't
6     researching to see if the policies or the things that
7     MRA had were actually still being followed, or if it
8     was new, or if we had to follow it.
9  Q  Okay. Did Raymond give you any specific feedback or
10    instruction after those conversations with Kelsey about
11    Heather Jackson's insistence on putting MRA policies or
12    inaccurate MRA policies into the handbook?
13 A  He just told me to stick to the MRA policy information.
14    I remember that being one of the things. He -- he
15    really just didn't want to be bothered with having an
16    attorney look over that particular area because she had
17    already given me inaccurate information. He preferred
18    that I work on it, and if I had questions to still call
19    MRA to verify.
20 Q  Okay. COVID-19 policies. I believe -- and I don't
21    want to state what the testimony was or even what the
22    questioning was -- so we might have to go into it just
23    a little bit again. But I believe there's some
24    discussion about COVID-19 policies being a part of,
25    we'll say, MRA compliance if I understood the testimony

Page 181
1     correctly. That you've got to comply with COVID-19
2     policies as part of what MRA wants to have done; is
3     that --
4  A  Yes.
5  Q  -- okay. And did you have any specific conversations
6     with anyone at JARS about obtaining assistance with
7     being compliant with COVID-19 policies separate and
8     distinct from complying with MRA?
9  A  Assistance from -- I don't understand.
10 Q  Hey, do we -- should we get outside legal counsel
11    because this is -- I mean, let's -- since the Spanish
12    flu. Right? We haven't had a pandemic since the
13    Spanish flu. So this is all new territory for
14    everybody in the state of Michigan and probably the
15    world. Was there any discussion about getting help
16    from outside legal counsel about how to handle these
17    executive orders specific to COVID-19?
18 A  No.
19 Q  Inspections. I think we had some testimony about
20    inspections. Did you go -- did a Mandy Garmo attend
21    inspections with you?
22 A  She came with me on inspections.
23 Q  Okay. How many inspections did you attend on behalf of
24    JARS?
25 A  I think four, maybe five. I'm not sure --

Page 230
1  A   I recall I may have assisted with one.  Usually HR
2      handles those things, but I have assisted in helping
3      write one or write sections and portions of one.
4  Q   Do you recall any specific?
5  A   Which employer?
6  Q   Yes.
7  A   I believe it was PharmaCo.
8  Q   Okay.
9  A   PharmaCo I did.
10 Q   I'm going to talk about noneconomic damages.  In
11     response to interrogatories that were served on you by
12     JARS, question 6 asked if you experienced any injury or
13     illness in connection with the events of the lawsuit,
14     and we have the response here.
15         So first question is, it's your position that your
16     anxiety and depression has been since the termination,
17     and you attribute that to the termination by JARS?
18 A   Yes.
19 Q   And then there's a reference to hypothyroidism.
20 A   Yes.
21 Q   That's a condition you have?
22 A   Yes.
23 Q   For a layperson, what is hypothyroidism?
24 A   So hypothyroidism deals with the thyroid gland, and
25     it's basically -- it's not functioning like it's

Page 231
1      supposed to.  The thyroid gland handles many different
2      aspects of the body, regulates everything from mental
3      to physical.  So weight gain, weight loss, eating, and
4      there could be over 300 other illnesses that could be
5      associated with a thyroid or a thyroid that's out of
6      balance can be -- be caused.
7          So for mine I am hypo meaning my thyroid is in
8      overdrive, and so usually I have to take medicine to
9      speed it down.  However, the condition can be
10     heightened where it will be out of -- my blood levels
11     will be out of whack if -- if there's an extreme like
12     stress or depression, that may happen.  Some depression
13     happens, but if it's extreme the levels can be kind of
14     off, and I'll experience a lot of issues with that.
15 Q   Okay, a lot of issues.  Can you be more specific?
16 A   Sure.  So I could have memory issues.  I can gain an
17     extreme amount of weight, and in gaining an extreme
18     amount of weight it seems like not a big deal.
19     However, as I stated before, I have a hiatal hernia,
20     and if I gain an extreme amount of weight with a hiatal
21     hernia I have problems digesting my food.  And I will
22     wake up in the middle of night choking on, like, my own
23     vomit because it's like food that can't digest, or I
24     will not eat, or I will not eat enough.  I will not be
25     able to eat enough.  I will sleep a lot.  There's other

Page 232
1      issues that are heightened.
2  Q   Okay.  Have you gained an extreme amount of weight
3      since you were terminated by JARS?
4  A   Yes.  15-some-odd pounds doesn't seem like a lot, but
5      it was enough to cause issues where I was having
6      complications with the hiatal hernia.  That I had to
7      have another procedure to see if there was something
8      that I could do or it could be removed, and the final
9      issue was you have to lose weight and you need to do it
10     quickly.
11 Q   Okay.  Procedure, is that -- were you referring to an
12     endoscopy?
13 A   Yeah.  It wasn't an endoscopy.  It was similar to that.
14     Basically a chip -- like microchip type of thing was
15     implanted into my stomach, and I had a device that I
16     kept near me for -- I think it was 24 or 48 hours, and
17     it monitored how my food digested to make sure it
18     didn't get stuck somewhere.
19 Q   Have you had hypothyroidism before you came -- before
20     you went to go work for JARS?
21 A   Yes.
22 Q   Okay.  When were you diagnosed with hypothyroidism?
23 A   I was 14 years old.
24 Q   Okay.  You were living here in Michigan when you got
25     that diagnosis?

Page 233
1  A   Yes.
2  Q   Do you recall the doctor that diagnosed you with
3      hypothyroidism?
4  A   Yes, Dr. Roderick Walker.  He was at Oakland --
5  Q   Roderick?
6  A   Yeah, Roderick.  He was at Oakwood Hospital at the
7      time.
8  Q   Okay.
9  A   Yes.
10 Q   Roderick Walker?
11 A   Yes.
12 Q   Okay.  And were you being treated at -- by Roderick
13     Walker at that time with any particular medicine or --
14 A   I went to see him for a physical for -- I was a
15     cheerleader, and while he was doing the physical he
16     just happened to touch my neck, and saw that it was a
17     bulge that shouldn't have been there.  No one knew.  I
18     had symptoms when I was younger that my parents didn't
19     realize what it was because we didn't know we had a
20     history of it in the family.
21         He then referred me to another doctor, a
22     specialist in that area, and that's when they did tests
23     and discovered that I had a thyroid condition.  And
24     they began to treat it with medication that did not
25     work, and then we went -- and I had a dosage of